McBRIDE *v.* McBRIDE.

4-7629                                                     187 S. W. 2d 341

Opinion delivered May 14, 1945.

*N. J. Henley,* for appellant.

*Virgil D. Willis,* for appellee.

SMITH, J. Noble Albert McBride, Sr., owned fourteen forty-acre tracts of land, on which he executed a mortgage March 2, 1925, to secure a loan made him by

the Federal Land Bank of St. Louis, Missouri, for the sum of $6,000, to be repaid in semi-annual payments, the last of which, if all were made, would have discharged the indebtedness in 1959.. His health failed, and he fell in arrears with his payments, and suit was filed by the bank to foreclose its mortgage. He had five sons, whose names were: Noble J., Ralph J., N. A., Dorsey B. and Claude A. Only one of these sons, the eldest, Noble J., was employed, and earning money, this son being a teacher in the Smith-Hughes Institute at Strawberry, Arkansas. The son, Noble J., was advised by his father in 1937 of the pendency of this suit, and the imminence of a decree foreclosing the mortgage, when, accompanied by his wife, he went to his father's home to see what arrangements could be made for the extension of the loan and postponement of the decree foreclosing the mortgage. Only one of the brothers, Ralph J., the second eldest son, could render any assistance. There was a round table discussion of means to meet the delinquent payments, as a result of which Noble J.'s wife mortgaged her fur coat, her diamond wedding ring, and an automobile, which she owned, to her father, as security for a loan of $500, and Noble J. and Ralph J. executed their joint promissory note to J. C. Baker, their uncle, to secure a loan in the sum of $300. All of this money was repaid by Noble J. except $98 paid by Ralph J. which, as we understand the record, was all the money Ralph J. ever paid. The $800 thus raised sufficed to meet the delinquent payments due on the mortgage, and placed the loan in good standing. The $98 paid by Ralph J. was given him by his wife, having been earned by her as a school teacher.

With the evident purpose of saving his lands, which constituted the home of N. A. McBride, Sr., and his wife, and all his children except Noble J., a warranty deed was executed in 1938 from the father and mother to their eldest sons, Noble J. and Ralph J. This deed was delivered to Noble J., who re-delivered it to his mother, who destroyed it without it having been recorded.

We think this deed furnishes the explanation of the subsequent conveyances of this land, that it was intended

only as a mortgage to secure Noble J. and Ralph J. for the payments previously made, and subsequently to be made by them. We think it is true beyond any doubt whatever. This arrangement was not satisfactory or final, and this mortgage in form a deed, appears to have been ignored by all the parties. Ralph J. furnishes the following explanation of its execution. His father had received an offer of $1,000 for his equity of redemption, this to be paid by conveying to McBride, Sr., a house and lot in the town of Marshall. Ralph J. asked his father to give him an opportunity to buy the land whereupon a deed to the brothers, Noble and Ralph, was executed.

The father and mother executed another, a warranty deed, to their son, Noble J., which recited the consideration of $1,000, which no one says was ever paid. This deed was dated August 29, 1938. Ralph testified that between the date of that deed and the deed to himself and his brother, Noble, he had done something over 300 days' work on the farm, and that "this was the way I paid my half of the $800" used in making the payment to the land bank.

Ralph at all times lived on the land, about 300 acres of which had at one time or another been under cultivation. He was asked, "how much did you receive (from the Federal government under the AAA program) while Noble (Noble J.) had it from 1938 to 1941?" and he answered: "I didn't receive any more than any other renter on the farm in proportion to what he had in." The dates referred to are 1938, the date of the deed to Noble J. McBride from his father and mother, and 1941, in which year Noble J. conveyed the land to his brother, Ralph. Between these dates Noble J. had expended, for taxes and repairs on the farm, and in discharging the semi-annual payments of maturities on the loan from the bank, the sum of $3,000. He had also sold certain timber on the land for the sum of $2,200, which was paid to the bank, and this payment, with other payments to the bank, made by Noble J., reduced the mortgaged indebtedness to the sum of $2,717.75.

On October 16, 1940, the father of these brothers died of tuberculosis, after a lingering illness, and on August 21, 1941, Noble J. McBride and Donna, his wife, executed to Ralph J. McBride and Mollie, his wife, a warranty deed conveying the entire 560 acres which deed recites that "the full consideration herein is $5,717.75, represented as follows: $2,717.75 due the bank, and $3,000 due Noble J., all of which Ralph assumed and agreed to pay. Ralph J. insists that this deed conveyed to him the fee simple title, and that he was thereafter the sole owner of the land. He testified that he was so advised by his uncle, William Mills, and W. F. Reeves, both reputable lawyers, that such was the effect of the deed. Mills did not testify, but Reeves testified that he had no recollection of any such conversation. Other testimony given by Reeves, presently to be stated, refutes this statement.

This suit was brought against Ralph J. by his three brothers, then living, and the widow of Noble J., then dead, to have this deed to Ralph from Noble J. declared a mortgage, and for an accounting and for partition. The complaint was dismissed as being without equity, and this appeal is from that decree.

The question presented for decision is the one of fact, whether the deed to Ralph from Noble conveyed the fee title, or was executed by way of security for the payment of the obligations which Ralph had assumed.

The deed from Noble J. and wife to Ralph and wife was dated August 29, 1941, and on September 1, 1941, an agreement between Ralph J. and his wife, and Ralph J.'s mother, was entered into. Because of the importance attached to this agreement by appellee, we copy it in full. It reads as follows:

### "Real Estate Agreement

"Know All Men by These Presents, that this contract made and entered into by and between Ralph McBride and his wife, Mollie McBride, and Core McBride is as follows:

"Whereas, Ralph McBride and Mollie McBride have become the purchasers of the N. A. McBride farm by deed from N. J. McBride for a definite consideration and desiring to provide for the comfort and welfare of his mother, Cora McBride, and his minor brother, Claude Albert McBride, hereby covenant with the said Cora McBride to the effect that said Cora McBride is to have possession of and the rents and profits from the SW¼ of SE¼ of section 26; and she is to have possession of and the rents and profits from about fifteen acres of cleared lands for the use and benefit of Claude Albert McBride, said fifteen acres being described as a part of the S½ of SW¼ of section 26 and a part of the N½ of NW¼ of section 35, being a strip of lands now under fence and all lying south of U. S. Highway 65 all in Twp. 15 N., R. 16 west.

"The taxes on all of said lands to be paid by Ralph McBride during the lifetime of his mother, Cora McBride, or until such a time as she may abandon said lands, and she is to have the use and benefit of the said fifteen acres above described for the use and benefit of the said Claude Albert McBride until he shall arrive at the age of twenty-one years, or a longer period if further agreed upon by all parties of this agreement, which may be arranged by supplemental agreement hereto.

"Witness the signature of the parties hereto this the 1st day of September, 1941."

It may first be said that if Mrs. McBride, the mother, had conveyed her entire interest in the lands of her husband, to her son, Noble J., she had no interest remaining which could have constituted a consideration for the execution of this agreement, but we think its meaning and purpose is explained in the testimony of appellants, which was to the following effect.

Claude A., the youngest brother, a member of the United States Marine Corp, at home on pre-embarkation leave, testified that his brother, Ralph, "agreed to repair the house in which his mother lived, put a roof on it, fix the cistern, and he was supposed to pay all medical

bills for mother, and buy the groceries and keep us in wood and things." These obligations were not discharged, except by the execution of the agreement above copied. This younger brother, now only 19 years of age, testified that Ralph admitted to him, after the death of their mother, which occurred March 10, 1944, that he, Claude, had an interest in the land, but that he would not do anything about it. Other brothers, who joined as plaintiffs, did not testify, as they were in the armed services of the government.

Ralph testified that the deed to him from his brother, Noble, was executed for the purpose of conveying to him the fee simple title, and was executed for the considerations and purposes expressed in the deed, that is, the obligation to pay his brother, Noble, $3,000, and the land bank the sum of $2,717.75. If this contention is true, Ralph will have acquired title to the land for a price less than the amount which the land bank had loaned on the land. There was conflitcing testimony as to the value of the land, but no one placed its value at an amount so small. A Dr. Daniel, who had practiced his profession since March, 1892, testified that he had known the McBride farm all his life, and that there had not been a day in the last quarter of a century when it could not have been sold for as much as eight to ten thousand dollars. Other witnesses placed its value at a higher figure. One J. J. Jones testified that the land was worth no more than the purchase price, which he stated to be $6,800, in view of the additional consideration that the mother was given the right to live on the land without paying rent.

Testimony given by Ralph was to the effect that W. F. Reeves had advised him that he had acquired a good title to the land, but Reeves gave testimony refuting that statement to the following effect. A few days after the death of Mrs. Cora McBride, the mother of all the sons, three of them, N. A., Ralph and N. J. came together to his office, and N. A. said that he wanted to know and have a fair understanding between them about the lands of their father. N. J. then related in the presence of Ralph and the other brother the circumstances under

which the $800 heretofore referred to had been raised, and then proceeded to say, "the land was conveyed to me with the understanding that it was to be security for the money I had put up, and all other money I should put up in the payment of interest at maturity on the Federal Land Bank mortgage and taxes. The place kept going down and I had to put out quite a lot of money on it, and I decided to bring a man over here and Ralph objected, and said he couldn't come over here, that he would not let him, so I wanted to get out of it some way or other, so I told him I would just turn it over to him, if he would assume the mortgage and the taxes, so it was agreed he would do so. . . . Ralph hadn't said a word when he (N. J.) got through he turned to Ralph and said, 'Now, Ralph, I want to hear what you have to say about it,' and Ralph said, 'Nothing much,' or something similar to that, and 'That's' not all of the understanding, but he didn't tell what was the understanding and agreement but that's about what he said."

This testimony, which was not denied by Ralph, can have only one meaning, and that is that whereas N. J. had apparently taken title under a warranty deed, which was given as security for obligations which he, N. J., had discharged and assumed. Ralph assumed the same relationship to the land by agreeing to assume the same obligations. In other words, one mortgagee conveyed to another, and the legal effect of this conveyance was to transfer to Ralph the security which N. J. had acquired under the warranty deed to him from his father and mother.

Ralph's title, whatever it may be, is based upon the deed to him from his brother, N. J., and no one could know better than N. J. whether the deed to him from his father and mother was a deed in fact, as it purported to be, or was, notwithstanding its form, a mere mortgage to secure a debt. N. J. died in his sleep during the night following the conversation detailed by Reeves.

Ralph insists that he acquired the apparent title evidenced by the deed to N. J. from his father and mother,

which had been duly recorded, and that he should be protected as an innocent purchaser.

It is inconceivable, however, that Ralph was an innocent purchaser. The testimony of Donna, the widow of N. J., manifests entire familiarity with every detail of these transactions. It was by the use of collateral largely furnished by her, that the $800 was raised, and paid and the foreclosure proceeding dismissed. She testified that for a long period of time before her husband executed the warranty deed to Ralph, his brother, there had been constant wrangling between the brothers about the land. Her testimony is to the unequivocal and positive effect that the deed to her husband from his father and mother had been executed by way of security for obligations which her husband had assumed. Appellee says in his brief that, ''the parties spent considerable time in negotiating and reducing the sale to figures and obligations, which were fully set out in writing, the purchase price and how it was to be paid fully and comprehensively set out in the vendor's lien, and the continuing obligation to the mother in a contract which was carefully drawn and considered by the parties.''

Ralph at all times made his home on the land, and it is inconceivable to believe that he did not know the nature and extent of N. J.'s claim against the land.

Appellee argues that the decree should be affirmed for the reason that this court has many times held that a deed, in form, will not be decreed to be a mortgage in fact, except upon testimony that is clear, unequivocal and convincing, and so we have. And it is insisted also that the testimony is sharply conflicting, and so it is. But while we have held that the relief of declaring an instrument in form a deed to be a mortgage in fact will not be granted except upon testimony that is clear and convincing, we have also held that it is not required that the testimony be undisputed; but that this relief will be granted if, notwithstanding conflicts in the testimony, that testimony which is credited and believed to be true, meets the requirements imposed by law. *James, et al.,*

v.. *Furr, et al.,* 126 Ark. 251, 190 S. W. 444; *Berard* v. *Fitzpatrick,* 134 Ark. 190, 203 S. W. 1039.

In the last of these cases, after holding, as many cases have held that an instrument executed for the purpose of securing the payment of money is in effect a mortgage, whatever its form may be, but that the testimony to make this showing must be clear and convincing. It was there further said: ''Indeed, in suits of this character the testimony is quite frequently in sharp conflict, but the relief prayed for is not refused on that account if, from the testimony as a whole, it clearly and certainly appears that the writing in question was not to have the effect which its terms ordinarily import.'' See, also, Jones on Mortgages, vol. 1, Eighth Ed., § 409, p. 510.

Here the testimony which we credit and believe to be true is clearly to the effect that it was not intended that N. J. should take title to the land as a purchaser, but was only given the deed as a security for the repayment of obligations which he had assumed, and his deed to his brother could only convey such title as he owned.

The decree will, therefore, be reversed, and the cause remanded with directions to declare the deed from N. J. to Ralph to be a mortgage and for further proceedings to adjust the equities of the parties.